FILED
12/15/17 9:56 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | : Case No. 17-22572-GLT |
| | : Chapter 11 |
| CIRCULATORY CENTERS | : (Jointly Administered) |
| OF AMERICA, LLC, *et al.*,[1] | : |
| | : |
| *Debtors.* | : |
| | : |
| | : |
| FIFTH THIRD BANK, | : Related to Dkt. Nos. 81, 95 |
| | : |
| | : |
| *Movant,* | : |
| | : |
| v. | : |
| | : |
| CIRCULATORY CENTERS OF | : |
| OF AMERICA, LLC, *et al.*, | : |
| | : |
| *Respondents.* | : |
| | : |

### MEMORANDUM OPINION

Kirk B. Burkley and Kerri Coriston Sturm for the Movant, Fifth Third Bank

Robert O Lampl and David L. Fuchs for the Debtors/Respondents, Circulatory Centers of America, LLC, *et al.*

   The Debtors, an affiliated group of medical practices, are in the midst of negotiating

a sale of substantially all of their assets. Their primary secured creditor, Fifth Third Bank ("Fifth

Third"), seeks the appointment of a chapter 11 trustee and relief from the automatic stay, alleging

that the current management team is acting in its own self-interest by allocating an inordinate

---

[1]   The Debtors in these jointly administered chapter 11 cases, along with the last four digits of each Debtor's federal tax-identification number, include: Circulatory Centers of America, LLC (6380) ("CC-America"); The Circulatory Center of West Virginia, Inc. (0225) ("CC-West Virginia"); The Circulatory Center of Pennsylvania, Inc. (5371) ("CC-Pennsylvania"); The Circulatory Center of Ohio, Inc. (2264) ("CC-Ohio"); and Circulatory Centers, P.C. (0855) ("CC-PC").

amount of the prospective sale proceeds to a non-debtor affiliate for the sole purpose of satisfying claims held by the U.S. Government and eliminating any personal liability the officers may have. Fifth Third asserts that these actions deprive the Debtors' bankruptcy estates of the value they are entitled to receive from the sale. The Debtors oppose the requested relief and contend that valid business justifications exist for their actions.

I.

Circulatory[2] is a collection of entities that provide specialized treatment for circulation problems, focusing on varicose veins and venous insufficiencies.[3] The medical practice is separately organized into four operating entities, one for each state in which it conducts business.[4] Three of the operating entities are chapter 11 debtors in this bankruptcy proceeding: CC-Pennsylvania maintains 11 offices throughout Pennsylvania,[5] CC-Ohio operates in five locations within the Buckeye State,[6] and CC-West Virginia utilizes just one office.[7] The remaining operating entity, Circulatory Center New York LLP ("CC-New York"), maintains an office in Jamestown, New York, but it did not seek bankruptcy protection.[8]

---

[2]    Throughout this Opinion, the term "Circulatory" refers to all of the entities within the Circulatory Center business, including all of the Debtors and their non-debtor affiliates.

[3]    Ex. 1, p. 10; Ex. 34.

[4]    Three of the Circulatory affiliates are no longer active. Circulatory Centers, P.C., is one of the debtors in these jointly administered chapter 11 proceedings, while Circulatory Center of Georgia, P.C. ("CC-Georgia") had a separate chapter 7 bankruptcy case pending in this Court. See Dkt. No. 21; see also In re Circulatory Centers of Georgia, P.C., Case No. 16-24530-GLT; October 27, 2017 Hearing Transcript, Dkt. No. 233 ("Oct. Trans.") at p. 19:18–20 ("We closed [CC-Georgia] several years ago … because of lack of performance.") Another entity, Circulatory Centers of Connecticut ("CC-Connecticut"), became dormant in late 2016 when it sold its "medical records" to another practice for $300,000. Id. at p. 20, 46.

[5]    Id. at ¶ 6(n).

[6]    Id. at ¶ 6(q).

[7]    Id. at ¶ 6(r).

[8]    Id. at ¶ 6(t).

2

Although each medical practice is separately organized, the entire business is run as a singular enterprise through the centralized management services of CC-America.[9] David Gilpatrick serves as Circulatory's president, and Thomas Certo is the chief executive officer.[10] Among other functions, CC-America provides scheduling, billing, credentialing, and human resources services to its affiliates.[11] It owns all the fixed assets and personal property used in the business and is required by agreement to provide these assets to the affiliated entities for use in their operations.[12] Under Circulatory's cash-management system, any profit derived from the individual medial practices flows upstream to CC-America for the purpose of compensating it for the management services it provides.[13] While each Circulatory entity shares common ownership, it is not uniform.[14]

In July 2016, Fifth Third obtained a judgment against the Debtors in the amount of $3,379,708.46 from the Court of Common Pleas of Allegheny County, Pennsylvania (the "State Court").[15] The judgement relates to various loans and credit facilities Fifth Third made to the

---

[9]     Oct. Trans. at p. 13; see also August 17. 2017 Hearing Transcript, Dkt. No. 88 ("Aug. Trans."), p. 17:23–24 ("We have different entities, but they're essentially one operation.").

[10]    Id. at ¶¶ 6(i)–(j). Gilpatrick explained that he is responsible for day-to-day operations while Thomas Certo focuses on "[b]igger picture strategic decisions." Oct. Trans. at p. 12.

[11]    Id.

[12]    Id. at ¶ 6(k).

[13]    Oct. Trans. at p. 14.

[14]    The members of CC-America are Gilpatrick, Everett Burns, Louis Certo, and the TMC Legacy Trust (wherein Thomas Certo is trustee). See *Joint Pretrial Statement/Stipulation*, Dkt. No. 163 (the "Stip.") at ¶ 6(l)–(m). Louis Certo also owns all the shares in CC-Pennsylvania, CC-Ohio, and Circulatory Centers, P.C., while Robert Musson holds all the equity in CC-West Virginia. Stip. at ¶¶ 6(o), (q), and (s); see also Case No. 17-22571-GLT, Dkt. No. 23.

[15]    See Stip. at ¶ 6(a). In addition to the Debtors, the judgment was also issued against CC-Georgia, CC-Connecticut, and Thomas Certo.

Debtors dating back to 2011.[16]  By virtue of the judgment and loan obligations, Fifth Third holds

perfected, first-priority security interests and liens on all the Debtors' assets.[17]

The Debtors petitioned the State Court to open or strike the judgment on the basis

that, among other things, the post-judgment interest rate and attorneys' fees were excessive.

Before the State Court could entertain argument on the matter, the Debtors sparked a parade of

bankruptcy filings which were seemingly designed to stall the State Court proceedings.

The first bankruptcy filing occurred on December 5, 2016 when CC-Georgia filed

a voluntary petition for relief under chapter 11 of title 11 of the U.S. Code (the "Bankruptcy

Code").[18]  The Debtors used the case to convince the State Court to suspend its proceedings as to

all judgment debtors, notwithstanding the fact that only one entity was in bankruptcy.[19]  Thereafter,

the Court was prompted to enter an order clarifying that the automatic stay does not apply to non-

debtor defendants.[20]  Two months later, the CC-Georgia case was converted to a chapter 7

proceeding.[21]

CC-West Virginia was the next affiliate to commence a bankruptcy case.[22]  It filed

a voluntary petition for chapter 11 relief on January 20, 2017, three days before the rescheduled

---

[16]     Id. at ¶¶ 6(b)–(f).

[17]     Id. at ¶ 6(g).

[18]     Case No. 16-24530-GLT, Dkt. No. 1.

[19]     Case No. 16-24530-GLT, Dkt. Nos.  10 (at ¶ 10 and Ex D) and No. 14 (at ¶ 10).

[20]     See *Modified Consent Order Regarding Emergency Motion for Relief from the Automatic Stay and Request
for Expedited Hearing*, Case No. 16-24530-GLT, Dkt No. 16.

[21]     Case No. 16-24530-GLT, Dkt. No. 29.

[22]     Case No. 17-20211-GLT, Dkt. No. 1.

argument on the petition to open the judgment.[23]  Although CC-West Virginia attempted to remove

the entire State Court action, this Court remanded it after just three weeks.[24]

The last round of bankruptcy filings occurred on June 23, 2017 when the remaining

Debtors commenced their own chapter 11 cases.  Their cases are being jointly administered with

the CC-West Virginia bankruptcy.

The State Court eventually addressed the merits of Fifth Third's judgment.  It

opened the judgment for the limited purpose of examining the post-judgment interest rate and the

attorneys' fees.[25]  But the principal amount of the judgment remains undisturbed and the State

Court declined to stay enforcement of that portion of the judgment (subject to any stay available

under 11 U.S.C. § 362).[26]

<u>The Sale Process</u>

Circulatory has explored the prospect of selling substantially all its assets for

several years.  With the assistance of a broker in 2014, it previously targeted approximately 14

potential purchasers and received at least two offers, including a letter of intent from USA Vein

Clinics of Chicago, LLC ("USA Vein") to acquire the business for $12,500,000.[27]  Circulatory

ultimately declined both offers[28] in a decision it may now regret.  According to the Debtors, the

advent of the Affordable Care Act (commonly known as "Obamacare") substantially diminished

---

[23]    <u>See</u> Case No. 17-2016-GLT, Dkt. Nos. 3 (at ¶ 12) and 8 (at ¶ 12) (admitting that final argument on the
Defendants' petition to strike was to occur on January 23, 2017).

[24]    <u>See</u> Case No. 17-2016-GLT, Dkt. No. 13.

[25]    Ex. 5.

[26]    <u>Id</u>.

[27]    <u>See</u> Oct. Trans. at p. 26–27, 36, 43; Ex. 33.

[28]    <u>See</u> Oct. Trans. at p. 51.

the profitability of their medical practices.[29]    With a new insurance market and reduced

reimbursement rates, patients were burdened with higher out-of-pocket costs, causing demand for

vascular medical services to greatly diminish.[30]    The Debtors now acknowledge their business

enterprise no longer maintains the value it previously had.

In this new reality, the Debtors embarked upon a "grass roots" effort to market the

assets on their own.[31]    Gilpatrick used his contacts within the American College of Phlebology to

rekindle interest in a potential sale by reaching out to three major players in the industry.[32]    These

actions culminated with a new letter of intent ("LOI") from USA Vein in January 2017 which

proposed to acquire CC-America and "affiliated entities" for a purchase price of $4,000,000.[33]

The LOI contemplated a payment of up to $2,500,000 at closing with the remaining balance

payable over 36 months.[34]

Four months later, USA Vein entered into two separate asset purchase agreements.

Under the first agreement with the Debtors and their non-debtor affiliate Gemini Holdings, Inc.,[35]

USA Vein agreed to purchase the Debtors' assets for $1,000,000 in cash at closing, with the

potential for an additional $1,500,000 payout over three years if certain performance metrics are

---

[29]    Oct. Trans. at pp. 36–39; Ex. 1 at p. 11.

[30]    Id.

[31]    See Oct. Trans. at 39:10–11; Stip. at ¶ 6(gg).

[32]    Oct. Trans. at p. 38–40, 43–44.  In addition to USA Vein, Gilpatrick identified Centers for Vein Restoration and Vein Clinics of America for which he had non-substantive discussions.

[33]    Stip. at ¶ 6(u).

[34]    Ex. 34.

[35]    Id. at ¶ 6(v) and (x).

satisfied.[36]  In a separate agreement, USA Vein agreed to purchase the assets of non-debtor CC-New York for $1,500,000, all of which is to be paid at closing.[37]

Although both agreements were dated as of May 4, 2017, the Debtors did not disclose the terms of sale until they filed a sale motion on July 18, 2017, nearly 25 days after the petition date.[38]  Fifth Third opposes the sale on the grounds that it does not satisfy 11 U.S.C. § 363(f),[39] and it refuses to consent to a sale without satisfactory assurances that a "robust marketing" effort has occurred to maximize the sale price.[40]

The current status of the Debtors' sale efforts is unclear and likely remains in flux pending the Court's ruling.  After completing its due diligence in September 2017, USA Vein sought a $1,250,000 reduction in the combined purchase price because some of the Circulatory doctors declined to enter into an employment agreement with the buyer.[41]  Pursuant to the parties' discussion, the price reduction would be absorbed exclusively by the Debtors, leaving the $1,500,000 purchase price for CC-New York intact.[42]  More recently, a new entity expressed interest in making a bid for the assets.  This second potential bidder initiated contact with the Debtors and has since engaged in several substantive discussions for the purpose of preparing a formal offer.[43]

---

[36]    Id. at ¶ 6(y)–(z); Ex. 42.  Under the Earnout Agreement, USA Vein agreed to pay $41,666.67 per month for 36 months provided that appropriate benchmarks are attained post-closing.

[37]    Id. at ¶ 6(aa); Ex. 41.

[38]    Dkt. No. 42; see also Exs. 41–42.

[39]    Dkt. No. 62.

[40]    See Dkt. No. 135.

[41]    See Stip. at ¶ 6(ff); Ex. 39.

[42]    Id.

[43]    Oct. Trans. at p. 43–44.

### Government Claims

The Debtors, together with certain of their officers and employees, are operating under the cloud of an active civil investigation instituted by the U.S. Department of Justice.[44] The Debtors are currently under investigation for violations of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and common-law claims of payment-by-mistake and unjust enrichment.[45] The employees and officers (including Thomas Certo) face potential claims for financial penalties and other sanctions.[46]

The United States filed an unsecured proof of claim against each of the Debtors in the amount of $38,586,328 and asserts that they are jointly and severally liable for treble damages and statutory penalties for submitting "false or fraudulent claims to the Medicare Program and other federal health care benefit programs[.]"[47] The government investigation arises out of a prepetition billing practice in which services were provided by non-physician practitioners but "billed as being provided incident to services by a physician," thereby allowing Debtors to be paid at a higher reimbursement rate under Medicare.[48] There is no allegation that services were not in fact provided, but rather the issue focuses on the method or rate at which the services were billed.[49] The Debtors claim they discontinued the challenged billing practice by early 2015, long before the bankruptcy cases were commenced.[50]

---

[44]    Id. at ¶ 6(hh), (ll).

[45]    Id. at ¶ 6(hh).

[46]    Id. at ¶ 6(ll)–(nn).

[47]    See, e.g., Claim No. 11-1.

[48]    See id. at ¶ 6(ii)–(jj).

[49]    Id. at ¶ 6(jj).

[50]    Oct. Trans. at p. 41.

Although the Debtors dispute the allegations, they have discussed a potential resolution of the investigation in exchange for a voluntary payment of approximately $1,500,000.[51] The discussions have apparently been fruitful as the Court is advised the Debtors and United States reached an agreement in principal on the matter.[52]  The agreement requires funding from the bankruptcy sale as well as a contribution from the various individuals.[53]

<u>The Pending Motions</u>

Fifth Third seeks the appointment of a trustee for each debtor under sections 1104(a)(1) and (a)(2) of the Bankruptcy Code.[54]  It maintains that relief is warranted for the following reasons:[55] (a) the sale is futile without Fifth Third's consent, and the bank refuses to consent to less than full payment without a trustee in place; (b) the business judgment of the Debtors' principals is clouded by an overarching desire to eliminate any personal liability they may have to the Government; (c) the Debtors' principals have exhibited poor, unstable, and unreasonable behavior (including personal threats to creditor constituencies) that suggest they are not capable of serving in their current roles; and (d) the Debtors are not forthcoming with information and are unable to timely satisfy their regular and ongoing obligations as chapter 11 debtors (including the periodic review of monthly operating reports).[56]  Fifth Third also seeks relief from the automatic stay for similar reasons.

---

[51]     <u>Id</u>. at ¶ 6(jj), (oo)–(pp).

[52]     <u>Id</u>. at ¶ 6(qq).

[53]     Oct. Trans. 59:2–4.

[54]     Dkt. Not. 81.

[55]     <u>Id</u>.

[56]     Aug. Trans. 7–10:23–1; <u>see also</u> Dkt. No. 68.

The parties agreed to submit the trustee motion and the motion for stay relief for the Court's consideration and defer prosecution of any remaining motions pending the release of the Court's decision. After conducting an evidentiary hearing on the two pending motions, this matter is ripe for adjudication.

The Court has jurisdiction in this matter under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (G). Venue is proper in this district pursuant to 28 U.S.C. § 1408.

## II.

A chapter 11 debtor usually acts as the trustee of its own bankruptcy estate as a "debtor in possession,"[57] but the U.S. Trustee or a party in interest may petition the Court to appoint a trustee to manage the estate instead.[58] As the Third Circuit has explained, "[t]he idea that existing management is best positioned to rescue a debtor from bankruptcy is precisely the reason why the appointment of a trustee is exceptional in Chapter 11 reorganizations."[59] Accordingly, there is a "strong presumption" against replacing the debtor with a Court-appointed trustee.[60]

To prevail, a movant seeking the appointment of a trustee must show, by clear and convincing evidence,[61] either: (1) there is "cause" to appoint a trustee, "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management";[62] or (2) the appointment would be "in the interests of creditors, any equity security

---

[57]    See 11 U.S.C. §§ 1101(1), 1107.

[58]    11 U.S.C. § 1104.

[59]    Off'l Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 577 (3d Cir. 2003) (internal citation and quotation marks omitted).

[60]    Id.

[61]    In re G-I Holdings, Inc., 385 F.3d 313, 317–18 (3d Cir. 2004).

[62]    11 U.S.C. § 1104(a)(1).

holders, and other interests of the estate."[63]  If the movant meets its burden on either standard, the

Court is required to appoint a trustee.[64]  However, it is within the Court's discretion to determine

whether the "conduct shown rises to a level sufficient to warrant the appointment of a trustee"

under section 1104(a)(1).[65]  Due to the fact-specific nature of the inquiry, the decision must be

made on a "case-by-case basis."[66]  The section 1104(a)(2) standard is more flexible, allowing the

Court to "utilize its broad equity powers to engage in a cost–benefit analysis."[67]  A survey of the

instances in which this Court has appointed or declined to appoint a chapter 11 trustee provides a

useful framework to guide its decision under the present facts.

      In one of its earliest published cases on the issue, In re O'Neil Village Personal

Care Corp., the Court declined to appoint a trustee because a state receiver was already managing

the debtor's estate, but it noted in dicta that it would have done so if it had retained jurisdiction

because one debtor–principal admitted to converting $170,000 from an investor and the other had

either feigned ignorance or demonstrated incompetence by failing to intervene in the transaction.[68]

In In re North American Communications, Inc., the Court held that the section 1104(a) standard

was satisfied because the debtor–principals had doubled their compensation while the debtor was

suffering net losses; directed the debtor to extend them substantial unsecured, interest-free loans

that they "paid off" with bonuses they assigned themselves; claimed $900,000 in travel and

---

[63]    11 U.S.C. § 1104(a)(2).

[64]    11 U.S.C. § 1104 (stating that the Court "shall order the appointment of a trustee"); see also In re Commonwealth Renewable Energy, Inc., 2016 WL 1599982 at *2 (Bankr. W.D. Pa. April 18, 2016).

[65]    In re Marvel Entm't Grp., Inc., 140 F.3d 463, 472 (3d Cir. 1998) (internal citation omitted).

[66]    In re Sharon Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989).

[67]    In re Sharon Steel Corp., 86 B.R. 455, 459 (Bankr. W.D. Pa. 1988), aff'd 871 F.2d 1217 (3d Cir. 1989).

[68]    In re O'Neil Village Personal Care Corp., 88 B.R. 76, 80 (Bankr. W.D. Pa. 1988).

entertainment expenses over four years; caused the debtor to purchase a yacht, airplane, and expensive cars for themselves and their families; and directed the debtor to set up affiliates in which only they retained ownership rights or interests.[69] The Court has also found cause to appoint a trustee where a debtor–principal filed a frivolous lawsuit seeking to divorce the creditors' committee from its counsel after the committee suggested it would be appropriate to remove him from upper management—an endeavor that also resulted in sanctions for his attorney.[70]

In In re Sharon Steel Corp., the Court determined a trustee was required under both section 1104 standards due to the existence of: (1) large prepetition transfers to entities under common control with the debtor that were *prima facie* voidable as insider preferences; (2) large prepetition transfers to the debtor–principal and his nephew that were *prima facie* fraudulent conveyances; (3) the failure of the debtor's management to pursue recoveries of insider preferences and fraudulent conveyances and its apparent inability to do so because of conflicts of interest; (4) the debtor's inability to extricate itself from a 28%–30% interest expense on its working capital loan, resulting in $4,000,000 per year in unnecessary interest; and (5) the imprudent repayment of $294,000,000 to secured creditors, continuing losses, and transfers to entities under common control with the debtor, resulting in the need for a high-interest working capital loan.[71] The Court separately determined that section 1104(a)(2) was satisfied by the unfair allocation of costs of certain offices among the debtor and other commonly controlled entities."[72]

---

[69]    In re N. Am. Commc'ns, Inc., 138 B.R. 175, 179–80 (Bankr. W.D. Pa. 1992).

[70]    In re Charter Techs., Inc., 160 B.R. 925, 931–33 (Bankr. W.D. Pa. 1993).

[71]    Sharon Steel Corp., 86 B.R. at 465–66.

[72]    Id.

The Court has also held that "animosity and acrimony" between the debtor–principal and principal creditor that risked incurring overwhelming litigation costs—coupled with the debtor–principal's prepetition diversion of funds for his own benefit—satisfied both section 1104 standards.[73]

On the other hand, decisions in which the Court declined to appoint a trustee despite evidence of acrimony or managerial problems show that the movant's burden under section 1104 is high. Acrimony was insufficient to establish cause in In re BG Petroleum, LLC because the parties had reached a settlement agreement on the central issue of contention—the debtor's failure to satisfy its obligations under a valuable ground lease—which afforded the movants a contractual remedy if post-settlement acrimony persisted.[74]  The Court also held that an inability to successfully mediate did not constitute acrimony meriting a trustee in In re Commonwealth Renewable Energy, Inc., emphasizing that "[t]he absence of any meaningful third-party creditors or parties in interest" meant that "a trustee [wa]s not needed to preserve value for those on the periphery of the dispute."[75]  Finally, in In re Five Rivers Petroleum, LLC, the Court had "serious concerns of management's capabilities" due to a number of issues, including the debtor's lack of a capital structure, habitually overdrawn bank accounts, its inability to address environmental concerns, and questionable accounting controls,[76] but it held that these factors were insufficient to establish cause for a trustee nor would they justify the high cost of a trustee.[77]

---

[73]    In re Shubh Hotels Pittsburgh, LLC, 2011 WL 7145601 at *4 (Bankr. W.D. Pa. Feb. 1, 2011).

[74]    In re BG Petroleum, LLC, 525 B.R. 260, 281–82 (Bankr. W.D. Pa. 2015).

[75]    In re Commonwealth Renewable Energy, Inc., 2016 WL 1599982 at *3–*4 (Bankr. W.D. Pa. Apr. 18, 2016).

[76]    In re Five Rivers Petroleum, LLC, 2013 WL 656026 at *4–5 (Bankr. W.D. Pa. 2013).

[77]    Id. at *8.

A common theme runs through these cases.  In instances where principals actively elevate their own interests above those of the debtor to the point that it causes or is substantially likely to cause significant damage to the bankruptcy estate, a trustee has been deemed appropriate.  Conversely, when alternative solutions exist to address potentially questionable management decisions, a trustee was deemed unnecessary.  Irrespective of the outcome, Chief Judge Deller previously noted that principals may retain control so long as they adhere to their fiduciary responsibilities:

> To be clear, the estate's fiduciaries will held to the exacting standard required under applicable law. The Court reaches this conclusion because "[i]f a debtor remains in possession—that is, if a trustee is not appointed—the debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession. Indeed, the willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"[78]

The Court will now consider these issues in the context of the present facts.

### A.

The call for a trustee is based primarily upon a belief that Circulatory management is diverting a substantial portion of the sale proceeds to CC-New York where they can be used to satisfy the Government's claims.  CC-New York refrained from commencing a bankruptcy case presumably because it is the only operating affiliate that did not pledge its assets to Fifth Third as collateral.  Without Court oversight and freed of the burden of satisfying Fifth Third's claims, CC-New York can distribute a larger percentage of its sale proceeds to unsecured creditors than its debtor–affiliates.  Fifth Third claims that Circulatory's management intends to use CC-New York

---

[78]    BG Petroleum, 525 B.R. at 282 (citing Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985).

to fund a settlement payment to the Government which would resolve its outstanding claims and eliminate any personal liability for the officers.  Because the consideration allocated to CC-New York is not commensurate with its value to the overall enterprise, Fifth Third suggests that management is advancing its own self-interests at the expense of creditors in the bankruptcy estate.

The Debtors contend that any proceeds allocated to CC-New York merely reflect its current market value.  Initially, the Debtors denied any involvement in the purchase price allocation and suggested it was determined solely by the buyer who coveted the New York practice:

> USA Vein Clinics of Chicago, LLC valued the New York market, and the physician who ran that office, as being extremely valuable to their potential acquisition.   As such, the value was supported by the buyer['s] determination as to the worth of the entity, and any attempt to construe the proposed sale otherwise is not supported by anything other than innuendo by [Fifth Third].[79]

Maintaining that the offer of a willing buyer is the best indicator of value, Debtors suggest that the $1,500,000 allocation for CC-New York is justified because it comes directly from the asset purchase agreement submitted by USA Vein.[80]

The Court finds nothing in the record to bolster the assertion that the buyer placed any particular value on the New York practice.   Throughout the sale negotiations, the communications show that USA Vein was making an offer for the collective business enterprise.  In its January 2017 LOI, USA Vein offered $4,000,000 for the "business of Circulatory Centers of America, LLC and affiliated entities[.]"[81]  It made no distinction between CC-New York and

---

[79]    Respondent's Narrative Statement of the Case, Dkt. No. 163; see also Dkt. No. 135.

[80]    Aug. 17 Trans., p. 17:19–21 ("We believe it's a more valuable entity and that was obviously the buyer's belief, as well.").

[81]    Ex. 34.

the other entities. Even after it sought a reduction in the purchase price upon the completion of its due-diligence examination, USA Vein showed no preference as to how the amounts were allocated. Confirming that its focus remained exclusively on the total purchase price, USA Vein admitted it was amenable to paying the newly-reduced $2,750,000 purchase price "per such allocation as may be agreed[.]"[82] In proceedings before this Court, USA Vein's counsel similarly affirmed its willingness to revert back to a single asset purchase agreement, thereby providing the Court and all vested parties with the ability to determine the appropriate allocations after closing.[83]

The concept of manufacturing a separate deal for CC-New York originated from Circulatory's management. After the letter of intent was accepted, the parties set out to draft a singular asset purchase agreement encompassing each of the Circulatory entities.[84] Indeed, the discussions advanced to the point that on March 1, 2017, buyer's counsel suggested an agreement could be "signed tomorrow."[85] A few days later, Circulatory's counsel requested that "we split the deal into two deals. One for Circ. Centers of New York and another for the balance of the companies."[86] The rationale for the change was readily acknowledged on the basis that "ownership of NY is different and the assets are not encumbered by the creditors of the other companies."[87] Consequently, a stand-alone purchase agreement was created for CC-New York.

---

[82]    Stip. at ¶ 6(ff); Ex. 39.

[83]    Audio Recording of Hearing, Courtroom A, Sept. 28, 2017 Hearing audio (from 11:44:25–11:45:05).

[84]    Ex. 35.

[85]    Id.

[86]    Ex. 43.

[87]    Id.

The record also demonstrates that Circulatory established the purchase-price allocation for CC-New York. In testimony before the Court, Thomas Certo conceded that USA Vein identified the assets and resources it wished to retain, including the doctor who ran the New York practice, but it was Circulatory that determined the portion of the purchase price allocable to the New York assets.[88]

The allocation of a portion of the sale proceeds in favor of a non-debtor is not, by itself, grounds for the appointment of a trustee. As one of the selling entities, there is no question that CC-New York practice had some intrinsic value separate and apart from its affiliates. Moreover, Circulatory's management cannot be faulted for identifying the portion of the consideration allocable to CC-New York because it was not a debtor in these bankruptcy proceedings, and it was obligated to repay liabilities on a different scale from those of its debtor-affiliates. The critical inquiry however, is whether the allocable share for CC-New York is rationally related to its value. Here, the Court finds that it was not.

By any objective measure, CC-New York is comparatively weaker than its operational affiliates. Among the four medical practices offered for sale, CC-New York produces the lowest gross revenue and performs the least number of medical procedures.[89] According to Gilpatrick, it "hovers around break even[.]"[90] Through the first seven months of 2017, CC-New York generated gross revenues of just over $220,000, representing a mere 4% of the total revenues

---

[88]    Oct. Trans. 53:9–18 ("[I]t was the buyer that requested Dr. Sam Rockwell who runs the practice in New York be included in on the sale because he's a radiologist and they need a radiologist to be able to provide the services that we provide. . . . Buyer requested that they retain the services of Dr. Sam Rockwell and for that, we needed to allocate a certain price to the New York practice.").

[89]    Stip. at ¶ 6(bb)-(cc); see also Oct. Trans. p. 18.

[90]    Oct. Trans. at 18:17.

earned by Circulatory during that period.[91]  Gilpatrick also conceded that additional expansion in New York occurred "at the wrong time" when the market for vascular services was receding.[92]

CC-Pennsylvania, by contrast, is "the highest revenue producer" within the Circulatory enterprise and consistently remains its most profitable practice.[93]  Through July 2017, CC-Pennsylvania's gross revenues exceeded $3,400,000 and accounted for 63% of all revenue produced by the Circulatory entities.[94]  CC-Ohio is second in terms of revenue production, and its performance has varied from profitability to break even.[95]  It accounts for nearly 24% of the total revenue generated by the enterprise, including approximately $1,200,000 in gross revenue through July 2017.[96]

The Court finds the level of consideration allocated to CC-New York to be wildly disproportionate to its overall value to the enterprise.[97]  Despite its relatively modest contributions to Circulatory's profitability, management attempts to allocate over half of the total sale proceeds to CC-New York.  The remaining three practices, which generate over 95% of the total revenue, are left to share the balance of the consideration.

In addition to prospectively receiving a lopsided portion of the sale proceeds, CC-New York also benefits from the timing and certainty of the payments to be made.  All of the funds payable to CC-New York must be tendered at closing.  They are not subject to offset or reduction

---

[91]    See Exs. 16-22.

[92]    Oct. Trans at 37:15–19.

[93]    Oct. Trans. at pp. 18–19, 36.

[94]    See *supra* note 91.

[95]    Id.

[96]    See *supra* note 91.

[97]    See Exs. 16–22.

of any kind.  By contrast, 60% of the purchase price for the Debtors' assets is subject to an earn-out agreement.  Because these additional payments are contingent on the buyer replicating the Debtors' financial performance, there is no assurance the supplemental consideration will completely materialize.[98]  After USA Vein reduced its offer, the disparity grew even larger as CC-New York continued to have an expectation of a $1,500,000 payout at closing, while the Debtors' consideration was cut by 50% and might be entirely contingent on the Debtor satisfying the stated benchmarks over a three-year term.

Circulatory's management offers no credible business justification for the disparity in treatment between the Debtors and CC-New York.  Rather, it has become increasingly apparent that their ultimate motive is to ensure that sufficient proceeds reach CC-New York to fund any settlement amount necessary to fully resolve the Government's claims.[99]  Assuming the enterprise liability owed to the Government can be satisfied, any residual personal liability of the principals would likewise be eviscerated.

The Court reaches this conclusion for two reasons.  First and foremost, the value allocated to CC-New York in the sale documents has remained constant throughout the sale process, and Circulatory's management appears unwilling to adjust it under any circumstances. After completing its due diligence, USA Vein demanded a reduction of the purchase price because Dr. Sam Rockwell, the individual who runs the New York practice, refused to join the buyers after closing.[100]  Given that Dr. Rockwell was previously described as an "extremely valuable"[101]

---

[98]    See *supra* note 35.

[99]    Aug. Trans. p. 16:21–23 (acknowledging that use of the New York entity "gives us a little more flexibility" in dealing with creditors.)

[100]    See *supra* note 41.

[101]    See *supra* note 79.

component in the New York practice, it would appear that CC-New York loses a substantial portion of its value in his absence. Yet when the parties agreed to a $1,250,000 reduction to the purchase price, the amount was deducted from the Debtors' transaction rather than from the CC-New York deal.[102]

Second, the Debtors concede that any amount ultimately paid to the Government from CC-New York bears no relationship to the magnitude of the claim it may have against that entity. In a prior hearing, the Debtors' counsel suggested that the Government's claims against New York could be "relatively minor[.]"[103]

These actions underscore the Court's concern that the purchase price for New York bears no relationship to the value of the underlying medical practice. Indeed, the Court must question what, if anything, buyer is getting from the CC-New York entity if Dr. Rockwell is not part of the transaction and all of the hard assets used in connection with the practice are owned by CC-America. Despite this, management continues to advocate a deal structure whereby the value that otherwise belongs within the Debtors' bankruptcy estates is funneled to a non-debtor affiliate.

After considering these items, the Court can only conclude that the Debtors' principals are advancing their own personal interests at the expense of creditors in the bankruptcy estate[104] in derogation of their fiduciary duties. An entity that generates just 4% of the gross revenues is projected to receive more than 50% of the sale proceeds without offset or reduction of any kind while the Debtors who generate the substantial portion of the revenues are slated to

---

[102]    See *supra* notes 41–42 and accompanying text.

[103]    Aug. Trans. at p. 17:20.

[104]    Although the record remains unclear as to the extent of any personal liability that may exists, the Court takes notice that Messrs. Certo, Gilpatrick, and Burns were each represented by their personal legal counsel in several hearings before this Court. Oct. Trans. at p.4.

receive payments which are largely contingent upon future events during the next three years. The Debtors have failed to provide a credible business justification for an allocation that reduces the distribution creditors might otherwise expect to receive. Once Fifth Third's voiced its objections, the Debtors also made no effort to re-calibrate the sale price in a manner consistent with the value contributed by each entity. The Court deems such inaction to be either willful ignorance for the appropriate sale allocation or an outright attempt to serve the personal interests of the Debtors' principals at the expense of the bankruptcy estate. Neither alternative is acceptable for the management of a debtor-in-possession.

For this reason, the Court finds that Fifth Third has met its burden of proof and demonstrated cause for the appointment of a trustee. Current management remains focused on preserving a predetermined distribution for CC-New York for the purpose of satisfying the Government's claims and alleviating any associated personal liability. Actions such as these which elevate the interests of the principals over those of the debtor-corporation and its creditors constitute a conflict of interest that runs counter to the principals' fiduciary duties.

The Court likewise finds that the appointment of a trustee is in the best interests of the Debtors' creditors. As discussed above, Debtors' allocations project that CC-New York will receive sale proceeds in amounts which are disproportionate to the value of the assets it will contribute to the sale. To the extent an excessive amount is paid over to CC-New York, the claims of the Government may be resolved, but it comes at the expense of all other creditors in the Debtors' estates. Accordingly, the Court finds it necessary to appoint an independent trustee to ensure that value is preserved in each estate and creditors ultimately receive distributions in the amounts they deserve.

21

A trustee can also reinvigorate the Debtors' marketing efforts which have been less than ideal up to now.  Although they retained a broker in the pre-Obamacare environment where their services were in demand and profitability was high, the Debtors have not embarked on an active campaign to identify prospective buyers under the current business conditions.  To date, sale discussions involve only two parties, one of which was not even contacted by the Debtors.[105]  Aside from the ongoing negotiations with those prospective purchasers, the Debtors concede that no marketing has occurred in 2017.[106]

The Court does not take the appointment of a trustee lightly, nor can it ignore the additional layer of administrative expense that a trustee brings to a business that is already experiencing financial difficulties.  Nevertheless, the path forward is for the Debtors to sell substantially all their assets.  A proper sale process will maximize creditor recoveries and allow distributions to be made within a reasonable period of time.  Although the Debtors initiated the sale efforts in these cases, it is increasingly apparent that management's insistence on preserving $1,500,000 of the cash consideration for CC-New York is a barrier to Court approval of the sale.  Absent a suitable allocation that reflects the value of the assets contributed by each selling entity, the parties are hopelessly deadlocked and will never achieve a closing.  The Court therefore finds that a trustee is necessary to salvage the sale efforts by appropriately marketing the assets, determining a suitable purchase price allocation, and working to consummate a deal with an acceptable buyer without further delay.  The Court finds that under these unusual and fact-specific circumstances, the benefits of a trustee outweighs the potential costs.

---

[105]    See Oct. Trans. at p. 43.

[106]    Oct. Trans. at p. 26.

III.

In light of its ruling that a trustee is warranted, the Court finds no basis to grant Fifth Third's request for stay relief.  The unrefuted evidence demonstrates that the assets subject to Fifth Third's liens are necessary to the Debtors' reorganization and their value can be maximized through a sale process featuring a thorough marketing of the goods available for purchase.[107] Given that one prospective buyer has already tendered an executed purchase agreement and another is conducting due diligence, the Court concludes that a sale conducted under the trustee's leadership is reasonably likely to occur within a reasonable period of time, thereby precluding stay relief under 11 U.S.C. § 362(d)(2).

The weight of the evidence also does not support Fifth Third's contention that, at this juncture, it is inadequately protected.  Fifth Third is currently receiving monthly adequate protection payments from the bankruptcy estate and the Court finds no credible proof that its collateral is depreciating in value while the sale process unfolds.[108]  Once the trustee is appointed, adequate protection payments can continue pending consummation of a sale.

IV.

For the foregoing reasons, the Court hereby grants Fifth Third's request for the appointment of a trustee and denies its request for stay relief.  With the appointment of a chapter 11 trustee, the Debtors' motion to extend the exclusivity period is hereby denied as moot.

An appropriate Order will issue.

Dated:        December 15, 2017        _____
                                        GREGORY L. TADDONIO
                                        UNITED STATES BANKRUTPCY JUDGE

---

[107]    Oct. Trans. p. 64.

[108]    Dkt. No. 26.

<u>Case administrator to mail to:</u>
Debtors
David L. Fuchs, Esq.
Kirk B. Burkley, Esq.
Office of the U.S. Trustee